**v.**

**Joshua STARR, et al., Defendants.**

**Civil No. PJM 14-2283**

United States District Court, D. Maryland.

Signed May 5, 2016

MEMORANDUM OPINION

PETER J. MESSITTE, UNITED STATES DISTRICT JUDGE

M.K., the minor son of M.K., Sr. and S.K. (the Parents), by and through his Parents, challenge the decision of an Administrative Law Judge (ALJ) that the Montgomery County Public Schools (MCPS) system was not obligated under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400, et seq., to reimburse the Parents for the cost of M.K.'s private school education for the 2012-2013 and 2013-2014 school years. M.K. and the Parents (collectively, the Plaintiffs) and Defendants Joshua P. Starr, former Superintendent of MCPS,[1] and Montgomery County Board of Education (hereinafter MCPS) have filed cross-motions for summary judgment (ECF Nos. 13 and 16). For the following reasons, the Court will **AFFIRM** the decision of the ALJ. Accordingly, the Plaintiffs' Motion for Summary Judgment (ECF No. 13) will be **DENIED**, and MCPS' Cross-Motion for Summary Judgment (ECF No. 16) will be **GRANTED**.

1. Joshua P. Starr is no longer the Superintendent of the Montgomery County Public Schools. The Interim Superintendent is Larry A. Bowers.

2. In considering a motion for summary judgment, the Court considers the facts in the light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009). Where, as here, the parties have filed cross-motions for summary judgment, the facts relevant to each motion must be considered in the light most favorable to the nonmovant. Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir.2003); see also M.L. ex rel. Leiman v. Starr, 121 F.Supp.3d 466, 470 n. 3 (D.Md.2015).

3. Although the parties vigorously dispute the importance of certain facts and the inferences

I.

A. Factual Background [2]

The essential facts are not in dispute.[3]

During the years at issue in this case, M.K. was a middle school student who had been diagnosed with an attention-deficit/hyperactivity disorder (ADHD) and with an anxiety disorder. ALJ Decision 8. He was found eligible for special education by MCPS as a student with a Specific Learning Disability believed to affect his academic ability in reading, writing, and math expression. Id. 9.

During the 2011-2012 school year, M.K. attended the Learning Academics Disabilities (LAD) program at Cabin John Middle School (Cabin John) in Montgomery County. Id. In late 2011, M.K. was evaluated by Dr. Joanne Ugolini, Psy. D., who wrote a psychological evaluation report, dated December 6, 2011, in which she noted that M.K.'s Individualized Education Plan (IEP) from March 2011 "indicates that many supports [at Cabin John] are currently in place" for providing M.K. the accommodations to "increase" his academic success. M-K Ex. 3 at 13 [4]; ALJ Decision

to be drawn from them, the underlying, critical facts are undisputed. See Ricci v. DeStefano, 557 U.S. at 563, 129 S.Ct. 2658. Prior to their Due Process Hearing, the parties jointly filed "Proposed Stipulations of Fact." See ALJ Decision 8 n.3. The Court draws largely from these stipulated—and thus undisputed—facts, which were incorporated into the ALJ's Findings of Fact. The Court also recites facts that are undisputed based on the parties' briefings as well as those facts that are clear on the face of the exhibits in the record.

4. The designation "M-K Ex. [number]" refers to exhibits offered by the Plaintiffs at the Due Process Hearing before the ALJ; "Bd. Ex. [number]" refers to exhibits offered by MCPS at the Due Process Hearing; and "[Name] T. [page number]" refers to testimony from the Due Process Hearing.

10. Dr. Ugolini also recommended additional accommodations, however, including more frequent breaks and providing M.K. with a school coach or mentor. M-K Ex. 3 at 13; ALJ Decision 10-11. M.K.'s parents subsequently provided a copy of Dr. Ugolini's report to Cabin John. ALJ Decision 9.

On February 1, 2012, an IEP team meeting was convened to review Dr. Ugolini's psychological evaluation. In consequence, the team added provisions increasing "check-ins" and counseling to M.K.'s then in-place IEP. ALJ Decision 11; Bd. Ex. 4 at 37. On February 27, 2012, another IEP team meeting was convened to conduct M.K.'s annual review. ALJ Decision 12. At this meeting, the Parents expressed concerns that M.K. was falling through the cracks and that Cabin John was not offering enough support. ALJ Decision 12; Plfs.' Mem. Support Mot. Summ. J. (Plfs.' Mot. Summ. J.) 4. The team thereafter generated an IEP, which proposed eight hours per week of special education outside the general education setting, twelve hours per week inside the general education setting, and three hours per month of speech and language therapy outside the general education setting. ALJ Decision 12. The February 27, 2012 IEP had service dates of February 27, 2012 through March 26, 2012. Id.

On March 27, 2012, yet another IEP team meeting was convened. Id. The Parents yet again expressed concerns that M.K. was not making sufficient academic progress and that MCPS was not doing enough to support M.K. socially and emotionally. Plfs.' Mot. Summ. J. 4; MCPS' Mem. Support Mot. Summ. J. (MCPS' Mot. Summ. J.) 6. In the IEP created during this meeting, the team proposed that M.K. continue to attend the LAD program at Cabin John. ALJ Decision 12. The services recommended were the same as those listed in the February 27, 2012

IEP. Id. The March 27, 2012 IEP had service dates through February 25, 2013. Id. In response to the Parents' concerns that M.K. was experiencing negative peer interactions, including bullying, the team agreed to have an MCPS psychologist, Dr. Barbara Butera, Ph.D., conduct an evaluation of M.K. Id. 13.

Dr. Butera conducted her psychological evaluation of M.K. from April 20, 2012 to May 18, 2012. Id. Her evaluation, completed on May 25, 2012, concluded, in part:

In the observations completed by this examiner, no overt signs of peer interaction difficulties were apparent. ... During the observations, [M.K.] exhibited a dependent learning style. ... Teachers in the observed class readily gave him the requested support.

In interview sessions, [M.K.] used the term "bullying" often; it appeared that he used the term to describe any peer interactions that are problematic or negative in nature. [M.K.] did indicate some continuing concern about negative peer interactions. ... At the same time, he was able to recount an instance where he successfully solved a difficulty with a peer and was able to acknowledge that his counselors and teachers form a team that supports him when he needs it.

M-K Ex. 16 at 7.

Around this time, still dissatisfied with the services being provided by MCPS, the Parents began to look for alternative educational placements for M.K. On May 18, 2012, M.K.'s mother submitted an Application for Admission to an Alternate School. Bd. Ex. 10-A. The Alternate School is a private school which provides children with learning difficulties a variety of educational supports. Plfs.' Mot. Summ. J. 7; see also ALJ Decision 14. The Alternate School has approximately twenty-five students in grades K-12. ALJ Decision 14.

Following Dr. Butera's report, various attempts were made to schedule another IEP meeting. MCPS originally scheduled the IEP meeting to review Dr. Butera's report for June 6, 2012, but due to various scheduling difficulties, many of which originated with the Parents,[5] the meeting was not held until August 20, 2012. ALJ Decision 16. At that meeting, the team proposed that M.K. receive eight hours per week of special education classroom instruction outside the general education setting for pupil enrichment and reading intervention; sixteen hours per week of special education classroom instruction within the general education setting in co-taught/supported classes for math, English, world studies, science and arts rotation; forty-five minutes per week of speech language services outside the general education setting; one hour and five minutes per week of counseling services outside the general education setting; and forty-five

minutes per week of speech language services within the general education setting, with service dates of August 20, 2012 to February 25, 2013. ALJ Decision 16-17.

During the meeting of August 20, 2012, the IEP team also made a referral to a Central IEP (CIEP) team to make a placement determination. ALJ Decision 17. According to the August 20, 2012 IEP, the placement determination was referred to CIEP because some members of the Cabin John team thought that M.K. required a self-contained English class that was not then available at Cabin John. Bd. Ex. 17 at 40; ALJ Decision 17. Since the referral to CIEP was made seven days before the start of school, the services on the August 20, 2012 IEP would be the services in place at Cabin John until a recommendation for a more intensive program could be discussed and implemented, if necessary.[6] Moore T. 772; ALJ Decision 17.

---

**5.** By letter, the parents informed MCPS that they could not meet on June 6 because their attorney would be out of the country and requested other dates. M-K Ex. 17; Bd. Ex. 14. In response, MCPS offered July 19, 2012, the earliest available meeting date for the MCPS team members. M.K., Sr. T. 66; *see also* Bd. Ex. 14. The Plaintiffs could not meet on that date due to a planned vacation and asked for alternatives on or around that time. M.K., Sr. T. 65-66. MCPS then offered August 2, 2012, which MCPS cancelled because the school did not receive a response from the Parents confirming that date, Bd. Ex. 14; ALJ Decision 16. On August 2, 2012, the Parents' attorney sent a letter to MCPS confirming a meeting for August 20, 2012. Bd. Ex. 14; ALJ Decision 16. In their Motion for Summary Judgment, the Plaintiffs argue at length about these delays, asserting that they are procedural violations of the IDEA. Plfs.' Mot. Summ. J. 21-23. In doing so, they contest the ALJ's factual finding that the Parents were the source of the majority of the scheduling difficulties. *Id.* Addressing the Parents' challenge to the ALJ's factual finding that "much of the delay and lack of cooperation [in scheduling IEP meetings] came from the Parents' side," ALJ Decision 30, the Court recognizes that, in

IDEA cases, a "district court must consider the ALJ's findings to be *prima facie* correct, and explain why, under this due weight standard, it has chosen to accept or not accept each of those findings." *DiBuo ex rel. DiBuo v. Board of Educ. Worcester Cty.*, 309 F.3d 184, 192 (4th Cir.2002) (citing *Hartmann v. County Bd. of Educ.*, 118 F.3d 996, 1000–01 (4th Cir.1997)). Upon its review of the record and the ALJ Decision, the Court concludes that the ALJ's factual findings in this regard were regularly made and are supported by the evidence (namely, the testimony of M.K.'s father and letters between MCPS and the Plaintiffs' attorney during the summer of 2012). Moreover, as will be explained in Part III.B, *infra*, disputes about the factual circumstances surrounding these delays and who was at fault are ultimately immaterial because M.K. did, in fact, have a FAPE in place for the 2012-2013 school year.

**6.** The Plaintiffs contend that they "did not know" where MCPS was proposing to send M.K. to school after the August 20, 2012 IEP meeting. Plfs.' Mot. Summ. J. 7. The ALJ found, on the basis of testimony and her review of the August 20, 2012 IEP, that "[i]t was stated throughout the August 20, 2012

On the same day as the August 20, 2012 IEP meeting, the Parents signed a contract with the Alternate School obligating them to pay the Alternate School so that M.K. could attend the Alternate School during the 2012-2013 school year. Bd. Ex. 16-C. Four days later, on August 24, 2012, the Parents notified MCPS that they would be placing M.K. at the Alternate School and reserved the right to seek public funding for the placement. ALJ Decision 17.

Throughout the 2012-2013 school year, while M.K. was enrolled at the Alternate School, the parties attempted to schedule the CIEP meeting called for in the August 20, 2012 IEP, but additional scheduling difficulties impeded their efforts. A CIEP team meeting was first convened on September 24, 2012. ALJ Decision 18. The team, however, was unable to complete the process and agreed to continue the meeting because the Chair of the meeting, George Moore, had not been informed prior to the meeting that M.K. was attending the Alternate School. *Id.* Moore believed that the Alternate School's presence at the CIEP team meeting was crucial. *Id.* He also wanted to personally observe M.K. at

the Alternate School, and the Parents agreed. *Id.; see also* Plfs.' Mot. Summ. J. 7-8. A series of subsequent scheduling delays occurred,[7] and Moore did not actually observe M.K. at the school until December 5, 2012. ALJ Decision 18. Following Moore's observation of M.K. at the Alternate School, further delays in scheduling occurred,[8] and the CIEP team meeting was not continued until March 19, 2013. *Id.* 18–19.

The March 19, 2013 CIEP team meeting was at times heated due to disagreements between the Parents and MCPS over whether M.K. had been bullied at MCPS and whether the school was doing enough to ensure his academic success. Plfs.' Mot. Summ. J. 9; ALJ Decision 21. According to Moore, who has conducted roughly 30,000 IEP meetings in his career, the March 19, 2013 meeting was one of the most uncomfortable and tension-filled meetings he had ever experienced, due in particular to the agitated manner of M.K.'s mother. ALJ Decision 21.

Despite these difficulties, the team was able to revise M.K.'s IEP. It recommended twenty hours per week of special education classroom instruction outside the general

IEP that Cabin John was [M.K.'s] residence and service school, and although not explicitly stated in the prior written notice, given the timeframe involved (seven days before the start of school) and that the CIEP team had not yet met, Cabin John is where [M.K.] would have reported for his first day of class in the 2012-2013 school year." ALJ Decision 17. The ALJ also found that "the services on the August 20, 2012 IEP would be the services in place "until the recommendation for a more intensive program could be discussed and implemented." *Id.* (internal quotations omitted). Whatever the Plaintiffs' contentions about the CIEP referral process and its effect on M.K.'s placement, the Court concludes that the findings by the ALJ here were regularly made, based on testimony and evidence. Upon its own review of the record, the Court will give them due deference. *See DiBuo,* 309 F.3d at 192; *see also M.C. v. Starr,* No. CIV.A.

DKC13–3617, 2014 WL 7404576, at *7 (D.Md. Dec. 29, 2014); *Cavanagh v. Grasmick,* 75 F.Supp.2d 446, 457 (D.Md.1999).

7. The Plaintiffs argue that these delays were the fault of MCPS, again challenging the ALJ's conclusion that the Plaintiffs caused the majority of the scheduling difficulties. *See* Plfs.' Mot. Summ. J. 23-25. Upon the Court's review of the record, the ALJ's findings in this regard are, again, entitled to due deference, as they were regularly made and supported by testimony and other evidence in the record. *M.C. v. Starr,* 2014 WL 7404576, at *7. But regardless, factual disputes about who is to blame for these delays are ultimately immaterial, as explained in Part III.B., *infra.*

8. *See* text accompanying note 7, *supra.*

education setting for math, English, world studies, science, and reading intervention; eight hours per week of special education classroom instruction for supported arts rotation and physical education; forty-five minutes per week of speech-language services outside the general education setting; one hour and five minutes per week of counseling services outside the general education setting; and forty-five minutes per week of speech-language services within the general education setting. *Id.* 19–20. Ultimately, the consensus of the team was that the least restrictive environment in which M.K.'s needs could be met was a private separate day school program, and they recommended that referrals be sent to The Katherine Thomas School, The Lab School, and High Road Academy.[9] *Id.* 20. In an Addendum to the IEP forms, Moore stated that he believed MCPS could meet M.K.'s needs, but due to the friction between the Parents and Cabin John, it would not be beneficial for M.K. to return to the school. Bd. Ex. 21 at 41; ALJ Decision 20.

The Parents agreed with the recommendation to send M.K. to a private school. Plfs.' Mot. Summ. J. 9; ALJ Decision 20. They expressed concerns, however, about requiring M.K. to interview at The Katherine Thomas School, The Lab School, and High Road Academy given M.K.'s anxiety disorder. Plfs.' Mot. Summ. J. 10. They asked whether the schools could arrange a time to observe M.K. at the Alternate School rather than interviewing him. Bd. Ex. 21 at 41; Plfs.' Mot. Summ. J. 10. Moore acknowledged that might be a good idea, but suggested that the Parents raise that issue with the schools. Bd. Ex. 21 at 41. MCPS sent referral packets to The Katherine Thomas School, The Lab School, and High Road Academy on March 27, 2013. ALJ Decision 21-22.

Following their receipt of the referral packets, two of the schools—The Katherine Thomas School and High Road Academy—made efforts to contact the Parents to schedule a time to observe M.K. at the Alternate School.[10] ALJ Decision 22-23. On April 5, 2013, Marjorie Theard, Admissions Director of The Katherine Thomas School, contacted M.K.'s mother, S.K., to schedule a visit. Bd. Ex. 27. S.K. had indicated that she did not wish to schedule a visit at that time and that, if she changed her mind, she would contact Theard. *Id.* S.K. did not contact Theard again. *Id.*

Similar efforts by High Road Academy were also rebuffed. In a letter to MCPS, Dr. Ellen F. Gaske, Ed.D., Executive Director of High Road Academy stated,

Numerous attempts were made to contact [the Plaintiffs] to arrange an intake and tour of our program throughout the entire month of April. However, we were not able to make contact with [the Plaintiffs] despite the voicemail messages that were left. Eventually, [M.K.'s moth-

---

9. Moore explained that MCPS could not refer M.K. to the Alternate School because the school was not approved by the Maryland State Department of Education. ALJ Decision 21; Moore T. 806. According to Moore, the referral to The Katherine Thomas School was appropriate because it was close to M.K.'s home and specializes in working with children with learning disabilities and children on the autism spectrum; the referral to High Road Academy was appropriate because it is a very data-driven program that serves children with significant learning disabilities and

has about twenty-three different reading programs, which would be helpful given M.K.'s reading deficit, and the referral to the Lab School of Washington was appropriate because it is licensed to provide services to children with specific learning disabilities and speech and language impairments. ALJ Decision 22; Moore T. 810-11.

10. After reviewing the referral packet, the Lab School declined to admit M.K. Bd. Ex. 26.

er] did call the school. ... She did inquire, however, as to whether or not High Road Academy would be willing to observe [M.K.] at the [Alternate School]. I agreed to do that and bring another teacher as well. The agreement was that [M.K.'s mother] would speak with [M.K.'s] teachers and have them contact me with schedule information, etc. I never heard anything further.

Bd. Ex. 28.

On June 6, 2013, the Parents executed a registration application for M.K. at the Alternate School for the 2013-2014 school year. Bd. Ex. 23-A. The terms and conditions of the application obligated the Parents to enroll M.K. at the Alternate School for the 2013-2014 school year, unless M.K. was not accepted. *Id.* The Parents requested that their registration fee check not be cashed until they became aware of their tuition aid package. *Id.*

Despite the non-responsiveness of the Plaintiffs to scheduling a visit with M.K.,[11] on July 24, 2013, High Road Academy informed MCPS that it had accepted M.K.'s referral application. Bd. Ex. 28. Moore has testified that he was unaware if MCPS actually followed-up with the Plaintiffs to inform them of M.K.'s acceptance, Moore T. 856, and M.K.'s father has testi-

fied that he only learned of High Road Academy's acceptance in late 2013 in the months leading up to the Due Process Hearing, M.K., Sr. T. 93.

By letter dated August 5, 2013, the Parents' attorney notified MCPS that M.K. would be attending the Alternate School for the 2013-2014 school year and requested that MCPS fund him at that placement, M-K Ex. 70-2. MCPS declined the request for funding and placement, stating that it had provided M.K. with an IEP for 2013-2014 school year, which the Parents declined to accept. M-K Ex. 72-1; Bd. Ex. 29.

## B. Procedural Background

On December 4, 2013, the Parents, on behalf of M.K., filed a Due Process Complaint with the Maryland Office of Administrative Hearings, requesting a hearing to review MCPS' identification, evaluation, or placement of M.K. under the IDEA in the 2012-2013 and 2013-2014 school years. ALJ Decision 1. Thereafter, a five-day Due Process Hearing was held, at which the ALJ heard testimony from six witnesses (the Parents; Rabbi Uri Myers, Chair of the Lower Middle School at the Alternate School; two special education teachers from Cabin John; and Moore) and admit-

---

11. In the their Motion for Summary Judgment, the Plaintiffs deny that M.K.'s mother was not responsive to the efforts of The Katherine Thomas School and High Road Academy in scheduling visits to the Alternate School. Plfs.' Mot. Summ. J. 10. Instead, they state that The Katherine Thomas School did not contact the Plaintiffs, and they characterize their interactions with High Road as a matter of "trading phone calls back and forth" and a series of "misunderstanding[s]." *Id.* The only support for these factual assertions in the record is the testimony of S.K., *see* S.K. T. 348-491, and the testimony of M.K.'s father, M.K., Sr., who testified about what S.K. communicated to him about her contacts with the schools, *see* M.K., Sr. T. 89-100. The ALJ found that S.K.'s testimony was

not credible because M.K.'s mother admitted she had memory issues. ALJ Decision 35. Here, the Court recognizes that "the factfinder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." *Justin G. ex rel. Gene R. v. Bd. of Educ. of Montgomery Cty.,* 148 F.Supp.2d 576, 588 (D.Md.2001) (quoting *Hunter ex rel. Hunter,* 84 F.Supp.2d 702, 706 (D.Md.2000)). In reviewing S.K.'s testimony of her interactions with the referral schools, much of which is riddled with "I don't remember" responses and contradictory answers, *see* S.K. T. 476-81, the Court concludes that the ALJ's credibility finding was in fact regularly made, supported by the evidence, and the Court thus gives it due deference.

ted and considered nearly one hundred exhibits submitted by the parties. ALJ Decision 3-8.

After the conclusion of the hearing, the ALJ rendered her decision, making eighty-two factual findings and holding that MCPS was not responsible for reimbursing the Plaintiffs' for the costs of M.K.'s attendance at the Alternate School for the 2012-2013 and 2013-2014 school years. In response to the Parents' arguments that MCPS delayed the IEP process in both the 2012-2013 and 2013-2014 school years, the ALJ concluded these delays did not constitute procedural violations of the IDEA because, in recounting the timeline of events, the chronology showed that much of the delay and lack of cooperation came from the Parents. ALJ Decision 28-30. The ALJ then concluded that, if any procedural errors were made by MCPS, they did not actually interfere with the provision of a FAPE to M.K. ALJ Decision 30-36.

The Plaintiffs filed their Complaint in this Court on July 17, 2014, appealing the decision of the ALJ. They maintain that they are entitled to reimbursement for M.K.'s enrollment at the Alternate School during the 2012-2013 and 2013-2014 school years, and they assert that the ALJ incorrectly and unreasonably concluded to the contrary. Compl. ¶¶ 50-57. They seek declaratory relief that MCPS violated M.K.'s rights under the IDEA. They also seek injunctive relief vacating the decision of the ALJ and ordering MCPS to reimburse them for the costs associated with enrolling M.K. at the Alternate School during the 2012-2013 and 2013-2014 school years. Compl. Prayer for Relief.

The parties have since filed cross-motions for summary judgment.

## II.

■ In considering cross-motions for summary judgment in an IDEA case, the "reviewing court is obliged to conduct a modified *de novo* review of the administrative record, giving due weight to the underlying administrative proceedings." *M.L. ex rel. Leiman v. Starr,* 121 F.Supp.3d 466, 474 (D.Md.2015) (citing *M.C. v. Starr,* No. DKC–13–3617, 2014 WL 7404576, at *6 (D.Md. Dec. 29, 2014)) (internal quotations omitted). This standard means that a reviewing court must consider an ALJ's findings of fact *"prima facie correct"* when they are made "in a regular manner and with evidentiary support." *Doyle v. Arlington Cnty. Sch. Bd.,* 953 F.2d 100, 105 (4th Cir.1991). If a district court "is not going to follow them, [it] is required to explain why it does not." *Id.*

■ "The Court then reaches its decision based on the preponderance of the evidence." *Leiman,* 121 F.Supp.3d at 474 (citing *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 192, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). In IDEA cases such as this one, in which plaintiffs are appealing the administrative decision below, plaintiffs "face an uphill battle for several reasons," not only because they must bear the burden of proof with respect to the evidence both in the administrative hearing and on appeal, but also because of the degree of deference owed to the administrative proceedings. *Wagner v. Bd. of Educ. of Montgomery Cty., Maryland,* 340 F.Supp.2d 603, 611 (D.Md.2004), In weighing the evidence before it, the reviewing court must not "substitute [its] own notions of sound educational policy for those of local school authorities." *M.C.,* 2014 WL 7404576, at *6 (internal citations and quotations omitted).

■ Importantly, this standard of review "works in tandem with the general standard of review for summary judgment, which also applies in IDEA cases." *Lei-*

*man*, 121 F.Supp.3d at 475 (quoting *M.C.*, 2014 WL 7404576, at *7) (internal quotations omitted). Summary judgment is therefore warranted when the moving party demonstrates, through reference to materials in the record, that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Leiman*, 121 F.Supp.3d at 475 (discussing Rule 56(a) in the context of summary judgment in IDEA cases). "If the party seeking summary judgment demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts." *Leiman*, 121 F.Supp.3d at 475 (citing *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In the case of cross-motions for summary judgment, the court views each motion "in a light most favorable to the non-movant." *Leiman*, 121 F.Supp.3d at 475 (citing *Linzer v. Sebelius*, No. AW–07–597, 2009 WL 2778269, at *4 (D.Md. Aug. 28, 2009); *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir.2003)).

## III.

### A. The Right to a Free Appropriate Public Education

■ Under the IDEA, children with disabilities between the ages of three and twenty-one have a right to a free appropriate public education, or "FAPE." 20 U.S.C. § 1412(a)(1)(A). "Maryland also has regulations governing the provisions of FAPEs to children with disabilities in accordance with the IDEA." *M.C.*, 2014 WL 7404576, at *1 (citing Md. Code Regs. Tit. 13A, § 05.01). In essence, "[a] FAPE is an education that provides 'meaningful access to the educational process' in 'the least restrictive environment' and is 'reasonably calculated to confer some educational ben-

efit' on the child with the disability." *Leiman*, 121 F.Supp.3d at 470 (quoting *M.C.*, 2014 WL 7404567, at *1 (citing *Rowley*, 458 U.S. at 192, 207, 102 S.Ct. 3034))). A FAPE must provide a benefit that amounts to "more than trivial progress," but the IDEA does not require that a school district provide a disabled child with the "best possible education," or that the education "maximize" each disabled child's "potential." *M.C.* 2014 WL 7404567, at *1 (citing *Rowley*, 458 U.S. at 192, 102 S.Ct. 3034; *Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir.1997)). In this way, "once a FAPE is offered, the school district need not offer additional educational services." *MM ex rel. DM v. School Dist. of Greenville Cty.*, 303 F.3d 523, 526–27 (4th Cir.2002).

In order to ensure that each learning disabled child is provided with a FAPE, the IDEA requires the school district to provide an appropriate Individualized Education Program (IEP) for the child. *See* 20 U.S.C. § 1414(d); *see also M.C.*, 2014 WL 7404567, at *1. "An appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *DM*, 303 F.3d at 527 (citing 20 U.S.C. § 1414(d)(1)(A)). An IEP is "prepared by an IEP Team, which consists of a representative of the school district, the child's teacher[s], the parents or guardian, and where appropriate, the child [him-or] herself." *DM*, 303 F.3d at 527 (citing 20 U.S.C. § 1414(d)(1)(B)).

■ Additionally, the IDEA "establishes a series of elaborate procedural safeguards 'designed to ensure that the parents or guardian of a child with a disability are both notified of a decision affecting their child and given an opportunity to object to these decisions.'" *DM*, 303 F.3d

at 527 (quoting *Gadsby v. Grasmick,* 109 F.3d 940, 956 (4th Cir.1997)). The IDEA, for example "requires that the parents or guardian of a disabled child be notified by the school district of any proposed change to their child's IEP." *DM,* 303 F.3d at 527 (citing 20 U.S.C. § 1415(b)). In Maryland, parents have the right to "voice disagreement with their children's proposed IEPs and request due process hearings before the Maryland Office of Administrative Hearings to address their concerns." *Leiman,* 121 F.Supp.3d at 470 (internal citations and quotations omitted).

 Moreover, if dissatisfied with a proposed IEP, "parents may place their children in private school that is 'appropriate to meet the child's needs' and 'seek tuition reimbursement from the state,' but *only if* 'the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." *Id.* (internal citations and quotations omitted) (emphasis added). In considering such a challenge by the parents, "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals." *DM,* 303 F.3d at 532 (quoting *Tice v. Botetourt County School Board,* 908 F.2d 1200, 1207 (4th Cir.1990)). In other words, a court "should not disturb an IEP simply because [it] disagree[s] with its content," and it is "obliged to defer to educators' decisions as long as an IEP provided the child the basic floor of opportunity that access to special education and related services provides." *DM,* 303 F.3d at 532 (internal quotations and citations omitted).

On appeal from the ALJ's Decision, the Plaintiffs seek reimbursement for M.K.'s tuition at the Alternate School for the 2012-2013 and 2013-2014 school years. The Court addresses the merits of the Plaintiffs' arguments with respect to both school years.

## B. The 2012-2013 School Year

In support of their right to reimbursement for placing M.K. at the Alternate School for the 2012-2013 school year, the Plaintiffs assert that MCPS committed multiple procedural violations of the IDEA, citing the various delays in scheduling the August 20, 2012 IEP meeting and the subsequent March 19, 2013 CIEP meeting. Plfs.' Mot. Summ. J. 21-25. The Plaintiffs take issue with the ALJ's conclusion that the Parents were ultimately responsible for many of the scheduling difficulties,[12] and its decision that MCPS did not commit any procedural violations. *Id.* In response, MCPS contends that the Court should defer to the ALJ's findings with respect to the cause of the delays, stating that each of the ALJ's findings carefully reviewed the cause of the cancellation for each and every IEP team meeting. MCPS' Mot. Summ. J. 19-25. MCPS argues that the ALJ properly assessed blame based on the evidence. *Id.* 24-25.

---

**12.** In their Motion for Summary judgment, the Plaintiffs state, "The ALJ's finding that the parents were solely responsible for the nearly seven month delay in finishing the IEP process is blatantly wrong and not supported by the evidence." Plfs.' Mot. Summ. J. 22. The Court agrees with MCPS that this statement mischaracterizes the ALJ's conclusion with respect to the scheduling delays. *See* MCPS' Mot. Summ. J. 19. The ALJ did not find that the Parents were "solely responsible," rather, the ALJ stated: "It seems manifestly unfair to hold MCPS responsible for a delay [sic] when the chronology shows that *much of the delay* and lack of cooperation came from the Parents' side, particularly given that the Parents are now attempting to use that delay as a sword in an attempt to seek funding for their unilateral private placement." ALJ Decision 30 (emphasis added).

The parties debate this issue extensively. As a preliminary matter, the Court does not find the Plaintiffs' arguments about the delays to be persuasive. After reciting the extensive chronology of the scheduling delays, the ALJ concluded that "much of the delay and lack of cooperation came from the Parents' side." ALJ Decision 29-30. In reviewing the ALJ's Decision, in which each finding of fact with respect to the delays is clearly supported through citation to the record, ALJ Decision 15-19, and in which reasoning is provided for the factual inferences made, ALJ Decision 29-30, the Court finds no grounds on which it could justifiably conclude that the ALJ's findings were not "regularly made" and therefore *not* entitled to due deference. *See Doyle,* 953 F.2d at 105. As the Fourth Circuit has explained, the requirement that factual findings be "regularly made" generally concerns "the *process* through which the findings were made" (e.g., whether there was a proper hearing, allowing both parties to present evidence and make arguments), not whether the parties agree with an administrative law judge's view of the case. *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.,* 516 F.3d 254, 259 (4th Cir.2008) (emphasis in original). The Plaintiffs attempt to argue that the ALJ treated the facts in a "one-sided" manner, Plfs.' Mot. Summ. J. 23, but this essentially amounts to a disagreement with the ALJ's conclusions about the evidence, it does not indicate a fundamental flaw in the fact-finding process, *see Peterson,* 516 F.3d at 260. The Court simply does not see any reason that the ALJ's conclusions with respect to the delays are "so deficient" that they are not entitled to deference. *See id.* Accordingly, the Court adopts them as its own.

More to the point, however, vigorous disagreement between the parties as to the source of each delay in scheduling the 2012 and 2013 IEP and CIEP meetings is ultimately immaterial in this case.

 It is certainly true that delays in the scheduling of an IEP team meeting can constitute actionable procedural violations of the IDEA if those delays mean that a child does not have any IEP in place prior to the start of the school year. *See DM,* 303 F.3d at 533 ("It is clear that, under the IDEA, the failure of a school district to have a final IEP in place at the beginning of a school year is a procedural defect."); *Justin G. ex rel. Gene R. v. Bd. of Educ. of Montgomery Cty.,* 148 F.Supp.2d 576, 583 (D.Md.2001) ("[T]he complete failure to develop an IEP for a disabled child prior to the beginning of the school year constitutes a serious violation of the IDEA.").[13] The mere fact of a procedural violation in the IEP process, however, does not alone entitle a party to reimbursement for a disabled child's unilateral enrollment in a private school. Under "well-established" Fourth Circuit precedent, "a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must

---

**13.** The Fourth Circuit has made clear, however, that if a school's failure to have an IEP in place prior to the start of a child's school year was the result of the *parents'* lack of cooperation in the IEP process, there is no procedural violation of the IDEA. *DM,* 303 F.3d at 535 ("[I]t would be improper to hold [the] School District liable for the procedural violation of failing to have the IEP completed and signed, when that failure was the result of [the parents'] lack of cooperation.") (internal quota-

tions and citations omitted). On the basis of this rule, the ALJ concluded that because the parents caused much of the delays in scheduling the IEP meetings, there was no procedural violation of the IDEA. ALJ Decision 30. The Court does not disagree with this ruling, but for the reasons set forth in this Part, *infra,* it believes the more useful inquiry for purposes of ultimately determining MCPS' liability is whether M.K. was actually denied a FAPE for the 2012-2013 school year.

*actually interfere with the provision of a FAPE* before the child and/or his parents would be entitled to reimbursement relief." *DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester Cty.*, 309 F.3d 184, 190–91 (4th Cir.2002) (emphasis added). Accordingly, even assuming that MCPS committed some procedural violations of the IDEA due to the delays in scheduling the August 20, 2012 IEP and March 19, 2013 CIEP team meetings, the Plaintiffs must show that MCPS interfered with the provision of a FAPE to M.K. *See Wagner*, 340 F.Supp.2d at 611 (noting that plaintiffs bear the burden of proof in IDEA cases). Based on the undisputed facts in the record, the Court concludes that the Plaintiffs have not satisfied this burden.

On March 27, 2012, MCPS conducted an IEP team meeting and put in place an IEP for M.K. with service dates from March 27, 2012 through February 25, 2013. ALJ Decision 12. In other words, as of March 2012, an IEP for M.K. was in place which would have encompassed the start of M.K.'s 2012-2013 school year at Cabin John. However, in response to the Parents' concerns that M.K. was being bullied, MCPS took further steps after developing the March 27, 2012 IEP, arranging for a psychologist, Dr. Butera, to observe M.K. *Id.* 13. Dr. Butera concluded that "no overt

signs of peer interaction difficulties were apparent," but recommended vigilance on the part of M.K.'s team in monitoring for any negative peer interactions should they arise. MK Ex. 16 at 7-8. Following Dr. Butera's report and in response to the Parents' continued concerns about the services being provided to M.K., MCPS convened an IEP meeting on August 20, 2012, in which the Parents and their attorney participated. ALJ Decision 16-17. As a result of this meeting, MCPS generated another IEP, this one with service dates of August 20, 2012 through February 25, 2013. *Id.*

In reviewing the record, the Court determines that the August 20, 2013 IEP was clearly in place prior to the start of the 2012-2013 school year, and it would have governed the special education services afforded to M.K. had he actually enrolled at Cabin John for that year.[14] *Id.* As there is no evidence in the record that the August 20, 2012 IEP was procedurally deficient in any manner, *see generally* Bd. Ex. 17, the question for the Court, then, is whether the August 20, 2012 IEP was *substantively* deficient. Deferring to the educators that this IEP would have provided M.K. with a basic floor of opportunity of access to special education services,

14. In her Decision, the ALJ states, quoting Moore's testimony, that "given that the referral to CIEP was seven days before the start of school 'and the Stay Put Program was the last approved document,' the services on the August 20, 2012 IEP would be the services in place 'until the recommendation for a more intensive program could be discussed and implemented.' " *Id.* 29. The Plaintiffs take issue with this statement, noting that the "stay put" concept has nothing to do with this case— "stay put" (they correctly note) is a statutory injunction that "requires a child to remain in his or her 'then-current educational placement' during the pendency of an IDEA hearing." Plfs.' Mot. Summ. J. 30-31 (quoting *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 59, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005)). In response, MCPS contends that the misnomer is of no consequence. Everyone present at the August 20, 2012 IEP team meeting, including the Parents, understood that Cabin John was prepared to implement M.K.'s August 20, 2012 IEP as of the first day of the 2012-2013 school year. MCPS' Mot. Summ. J. 28. What matters, MCPS argues, is that the ALJ found that the August 20, 2012 IEP would be implemented had M.K. enrolled at the Alternate School at the beginning of the 2012-2013 school year, not that she incorrectly made reference to "stay put" procedures when quoting a witness. *See id.* The Court agrees with MCPS.

*see DM,* 303 F.3d at 532, the Court sees no basis for concluding to the contrary. The August 20, 2012 IEP substantially increased the services that would be provided to M.K. in comparison to M.K.'s prior March 27, 2012 IEP: it provided for four more hours per week of special education inside the general education setting, increased speech and language therapy, and the addition of weekly counseling services. ALJ Decision 12; 16-17. The ALJ found that the August 20, 2012 IEP would have provided M.K. with a FAPE for the 2012-2013 school year, and this Court agrees.

Despite these facts, the Plaintiffs assert that the August 20, 2012 IEP denied M.K. a FAPE. In support, they claim that "there was confusion about next steps [during the meeting] and everyone agreed that M.K. needed more than Cabin John could provide." Plfs' Mot. Summ. J. 32. They also say that Addie Davis, M.K.'s case manager who was a member of the August 20, 2012 IEP team, testified at the Due Process Hearing that Cabin John could not provide an appropriate education for M.K. because it did not have a self-contained English class, a class that the IEP team found M.K. needed in order to make meaningful educational progress. *Id.* 32. The Plaintiffs further contend that a comparison between M.K.'s August 20, 2012 IEP and the March 19, 2013 CIEP placement is dispositive. The Plaintiffs reason that because the March 19, 2013 CIEP document recommended increased specialized instruction outside the general education setting, the August 20, 2012 IEP did not provide M.K. with a FAPE. Plfs' Mot. Summ. J. 33-34. Plfs' Opp'n to MCPS' Mot. Summ. J. (Plfs' Opp'n) 15. Finally, the Plaintiffs suggest that Moore's testimony at the Due Process Hearing that Cabin John could have provided M.K. with a FAPE is not credible. Plfs' Mot. Summ. J. 33-34.

The Court finds these arguments without merit.

First, the Court has reviewed the August 20, 2012 IEP and Davis' testimony, and concludes that this evidence does not support the Plaintiffs' contention that Cabin John could *not* provide an appropriate education for M.K. under the IEP in place at the start of the school year. The fact that the August 20, 2012 IEP team referred M.K.'s case to a CIEP team does not amount to an admission that the services in place were inadequate to provide M.K. with some meaningful educational benefit, or that Cabin John otherwise could not provide M.K. with a FAPE. On this issue, the August 20, 2012 IEP document simply states:

> As team began discussion of added supports...teachers indicated that they felt [M.K.] required more self contained [sic] classes to help him make progress in academics. Last year he struggled in co taught [sic] and supported English, Math and science. Based on this Mrs. Strain [M.K.'s English teacher] said she felt that the curriculum was going to be difficult for [M.K.] without and [sic] increase in self contained [sic] classes. [Cabin John] does not have self contained [sic] classes [ ] file will be sent to CIEP.

Bd. Ex. 17 at 40. The Court does not take this referral to mean that "everyone agreed" that the August 20, 2012 IEP failed to provide a FAPE, as suggested by the Plaintiffs.

Davis' testimony does nothing to advance the Plaintiffs' argument, either. When asked, "Do you have an opinion as to whether [Cabin John] offered enough?," she replied, "I do. I think we did offer enough." Davis T. 651. When asked, "Had [M.K.] remained at Cabin John Middle School ... under the August 20, 2012 IEP ... do you have an opinion as to whether

he would have continued to receive educational benefit ...?", Davis responded, "Yes. [M.K.] didn't attend at all during that school year, but we would have been able to implement the accommodations and supplementary aids and services at Cabin John and he would have continued to benefit from instruction." *Id.* Far from supporting the Plaintiffs' contention that the August 20, 2012 did not put a FAPE in place, Davis' testimony confirms the contrary. As noted above, IDEA case law makes clear that courts should not ordinarily second-guess professional educators when it comes to the adequacy of an IEP, provided that its formulation was procedurally proper. *DM*, 303 F.3d at 532 ("We have always been, and we should continue to be, reluctant to second-guess professional educators ... [O]nce a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals.") (quoting *Tice*, 908 F.2d at 1207).

■ Second, the Court concludes that comparing the services provided in the March 19, 2013 CIEP document with those in the August 20, 2012 IEP document does not justify a finding that the latter failed to provide M.K. with a FAPE. The Plaintiffs seem to contend that because the March 19, 2013 CIEP meeting resulted in a placement recommendation with ten more hours per week in specialized instruction outside the general education environment, the August 20, 2012 IEP did not afford M.K. with a FAPE. Plfs.' Opp'n 15. In essence, the Plaintiffs argue that because a subsequent IEP provided more services than a prior IEP, the prior IEP constituted a denial of a FAPE. The Court rejects this proposition. If a later IEP could constitute evidence that an earlier IEP was inadequate, school districts would incur liability for failure to provide a FAPE *every time* a student's services were increased between IEPs. For this reason, courts should evaluate the appropriateness of an IEP as of the time it was created, not on the basis of services provided in subsequent IEPs.[15] *See R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 195 (2d Cir.2012) ("[C]ourts must evaluate the adequacy of an IEP prospectively as of the time of the parents' placement decision and may not consider 'retrospective testimony' regarding services not listed in the IEP."); *F.O. v. New York City Dept. of Educ.*, 976 F.Supp.2d 499, 513 (S.D.N.Y.2013) (declining to consider a 2011-2012 IEP in determining whether a 2010-2011 IEP was appropriate).

Third, and finally, the Court rejects the Plaintiffs' challenge to the credibility of Moore's testimony concerning Cabin John's capacity to provide a FAPE to M.K. Again citing March 19, 2013 CIEP document, the Plaintiffs question whether Cab-

---

**15.** In a similar vein, the Plaintiffs argue that the March 19, 2013 CIEP put in place services that should have been implemented much earlier in time, given that the referral for the meeting was made in August 2012. This delay, they say, denied M.K. a FAPE. While this argument might be more persuasive had M.K. actually attended Cabin John for the 2012-2013 year, the Parents had already enrolled M.K. in the Alternate School for the school year. As the ALJ noted:

> Mr. Moore and Ms. Davis testified at the hearing that Cabin John could have programmed for the Student in accordance with the services on the August 20, 2012 IEP in place while CIEP met to discuss and implement the recommendation for an even more intensive program ... but they were never given that opportunity because the Parents enrolled [M.K.] at [the Alternate School] on the same day as the August 20, 2012 IEP meeting and the referral was made to the CIEP.

ALJ Decision 12. The delay in scheduling the CIEP meeting, regardless of who was at fault, ultimately had no practical effect on the services being provided to M.K. during the 2012-2013 school year.

in John could ever have provided M.K. with a FAPE, given that the· CIEP team recommended private school placement in March· 2013. Plfs.' Mot. Summ. J. 33. In doing so, the Plaintiffs assert that Moore's testimony that the March 19, 2013 CIEP team only referred M.K. to private day schools because of friction ·between the Parents and MCPS is not credible. If his testimony were true, the Plaintiffs say, Moore would have been violating federal and· state law regarding the least restrictive placement. *Id.* (citing 20 U.S.C. § 1412(a)(5)(A); Md. Code Regs. 13A.05.01.10). Importantly, however, the ALJ found Moore's testimony to be "very credible and compelling," "[g]iven the 30,-000 or so IEP meetings he has conducted." ALJ Decision 33. "[T]he fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." *Justin G.*, 148 F.Supp.2d at 588. The Court sees no basis here to find that this credibility determination was not regularly made, and it defers to it accordingly.

Ultimately, in order to establish that the August 20, ·2012 .IEP did not .offer · a FAPE, the Plaintiffs had to point to evidence that the IEP failed to provide "*some* educational benefit" to M.K. *See Rowley*, 458 U.S. at 200, 102 S.Ct. 3034 (emphasis added). But, as. explained above, the Plaintiffs have failed to identify any record evidence suggesting that the August 20, 2012 IEP was inadequate, or that Cabin John was incapable of providing M.K. with a FAPE during the 2012-2013 school year. Notably, the Plaintiffs have offered no expert testimony on this issue. Even the psychologist hired by the Parents, Dr. Ugolini, Psy. D., concluded that "many supports [at Cabin John] are currently in place" for providing M.K. the accommodations to "increase" his academic success. M-K Ex. 3 at 13. Put simply, the Plaintiffs have not shown on the basis of the undis-

puted facts in the record that MCPS failed to offer M.K. a FAPE for the 2012-2013 school year. Accordingly, even if the ALJ erred in concluding that no procedural violation of the IDEA occurred—as the Plaintiffs so vigorously contend—it cannot fairly be said that M.K. was denied a FAPE in 2012-2013 by reason of such delays.

## C. The 2013-2014 School Year

The parties agree' that the March 19, 2013 CIEP document recommending placement at The Katherine Thomas School, The Lab School, or High Road Academy was the IEP in place for the 2013-2014 school year. ALJ Decision 20. The Plaintiffs did not object to the IEP during the March 19, 2013 meeting, *see* T. 225, nor do they contend on appeal that placement at one of the these three private day schools would not have provided M.K. with a FAPE for the 2013-2014 school year. Instead, they argue that MCPS denied M.K. a FAPE because it failed to complete the private school referral process. Plfs.' Mot. Summ. J. 29-30. They point in particular to MCPS' failure to notify the Parents of High Road's acceptance of M.K. in July 2013. Plfs.' Opp'n 7.

According to MCPS, the ALJ correctly concluded that the Parents' refusal to cooperate in the referral process frustrated MCPS' attempts to identify an appropriate educational placement for M.K. MCPS' Mot. Summ. J. 30-34. MCPS also argues that whether the Parents were notified of High Road Academy's letter of July 24, 2013 is irrelevant, given that the Parents had signed an enrollment contract for M.K. to attend the Alternate School on June 6, 2013, and would not have accepted any FAPE offered by MCPS that did not include reimbursement for the Alternate School. MCPS' Reply to Plfs.' Opp'n (MCPS' Reply) 16. As such, the school system argues, MCPS should not be liable

for any procedural violations of the IDEA with respect to the referral process. MCPS' Mot. Summ. J. 30-34.

The Court agrees with MCPS.

 As noted, a school district will not be liable for a procedural violation under the IDEA unless that violation actually impeded the provision of a FAPE to a disabled child. *DiBuo*, 309 F.3d at 190. In addressing whether an alleged procedural error is actionable, a court must conduct an analysis akin to a harmless error standard of review: if a court finds that a procedural error occurred, it must determine whether that error had any actual effect on the disabled child's access to a FAPE before holding a school district liable for damages under the IDEA. *See MC*, 2014 WL 7404576, at *14 n. 12 ("[S]omething more than a simple procedural violation [of the IDEA] must exist in order for an aggrieved student to prevail on a claim that he has not been provided a FAPE. Thus, unless the procedural violation interferes with the provision of the FAPE, for instance, by causing the student to lose an 'educational benefit or opportunity[,]' then it is harmless error.") (internal citations and quotations omitted); *see also DM*, 303 F.3d at 535 (assessing whether there is any "evidence that [the child's] parents *would have* accepted any FAPE offered by the [school district] that did not include

reimbursement" for their desired private program") (emphasis added).

In the case of the private school referral process for M.K. which occurred between March and July 2013, the Court can identify only one arguably actionable procedural violation, [16] i.e., there is no evidence in the record that MCPS ever notified the Plaintiffs of M.K.'s acceptance at High Road Academy on July 24, 2013. However, given the ALJ's factual findings about the referral process and the Court's own review of the record, the Court cannot conclude that this procedural error actually resulted in "any lost educational opportunity" for M.K. *See DM*, 303 F.3d at 535.

At the March 19, 2013 CIEP meeting, the Parents suggested that The Katherine Thomas School, High Road Academy, and The Lab School observe M.K. at the Alternate School rather than requiring him to interview at these three new schools. Bd. Ex. 21 at 39, 41. Stating that this was a good idea, Moore suggested that the Parents inquire about such an arrangement when each of the referred schools called to set up appointments. *Id.* But after being contacted by two of the schools, the Parents did not follow up on making any such arrangements for M.K. to be observed.[17] As the ALJ found:

> When Ms. Marjorie Theard from The Katherine Thomas School called [M.K.'s] mother on April 5, 2013, the mother told

16. The Plaintiffs suggest that MCPS committed other procedural violations throughout the referral process, namely by failing to contact the Plaintiffs on multiple occasions about the status of the referrals. Plfs.' Opp'n 7. The Court, however, finds this proposition difficult to credit. It is undisputed that MCPS forwarded referral packets to the appropriate schools shortly after the March 19, 2013 CIEP meeting. ALJ Decision 21-22. It is also undisputed that two of the schools—The Katherine Thomas School and High Road Academy—initiated contact with the Parents, who rebuffed their attempts to schedule visits. *See* Part I, supra; *see also* text accompanying note 11. The Par-

ents' assertion that *MCPS* somehow erred in not communicating with the Parents—at the same time that two schools were attempting (and failing) to make contact with them—is highly dubious.

17. Although the Plaintiffs deny that M.K.'s mother was not responsive to the efforts of The Katherine Thomas School and High Road Academy in scheduling visits to the Alternate School, this contention is not supported by the evidence. *See* text accompanying note 11, *supra*.

Ms. Theard that she did not wish to schedule a visit at that time and if the mother changed her mind, she would call Ms. Theard. This was documented in a July 23, 2013 letter that Ms. Theard sent to MCPS indicating that the file was being closed for inactivity. The Parents were copied on that letter. Bd. Ex. 27. Similarly, on April 29, 2013, Dr. Gaske of High Road Academy sent an email indicating that she had called the Student's mother going on four times and had yet to receive a response. Bd. Ex. 23. When the mother finally did respond, Dr. Gaske agreed to observe [M.K.] at [the Alternate School] and bring along another teacher as well. The mother agreed to speak to [M.K.'s] teachers at [the Alternate School] and have them contact Dr. Gaske, but Dr. Gaske never heard anything else.

ALJ Decision 35. On the basis of these communications, the ALJ determined that the Parents had refused to cooperate in the referral process and therefore frustrated MCPS' placement efforts. *See id.* 36. After its own review of the record, the Court concludes that the ALJ's findings were regularly made and supported by the evidence, and it agrees that the parents made "a considerably less than whole-hearted effort . . . to cooperate in the joint enterprise that the IEP is supposed to be," *see S.M., et al. v. Weast, et al.,* 240 F.Supp.2d 426, 436 (D.Md.2003).

Moreover, at the same time that the Parents were refusing to return phone calls or arrange for M.K. to move forward in the referral process, they were also arranging for M.K. to attend the Alternate School for the 2013-2014 school year. As of June 6, 2013, the Parents had signed a registration application for M.K. to attend the Alternate School, Bd. Ex. 23-A, a school to which MCPS could not refer M.K. because it was not an approved Maryland State Department of Education program (as the Parents were made aware during the March 19, 2013 CIEP meeting, *see* Bd. Ex. 21 at 41). The terms and conditions of the application obligated the Parents to enroll M.K. at the Alternate School for the 2013-2014 school year unless M.K. was not accepted. Bd. Ex. 23-A. Although the Parents requested that their registration fee check not be cashed until they received their tuition aid package, they did not indicate that they desired to make M.K.'s enrollment at the Alternate School contingent upon M.K.'s acceptance at another private school. *Id.*

In light of the Parents' demonstrated lack of cooperation with the referral process, and in light of the affirmative steps the Parents took to enroll M.K. at the Alternate School in June 2013, the Court finds ample grounds to affirm the decision of the ALJ and conclude that the Parents would not have accepted MCPS' referral, even if the process were properly completed. Indeed, there is simply "no evidence" in the record before the Court that the Parents "would have accepted any FAPE offered" by MCPS "that did not include reimbursement" for the Alternate School, *see DM,* 303 F.3d at 535. As such, the Court determines that no lost educational opportunity resulted from MCPS' failure to notify the Parents of M.K.'s acceptance at High Road Academy.[18] *See id.* For this reason, the Plaintiffs are not entitled to reimbursement for M.K.'s attendance at

---

18. The Court does not mean to minimize the importance of a school's obligations during a private school referral process to notify parents of key developments with respect to the referrals. Certainly, major communication failures could result in denials of FAPEs to affected children. MCPS would be well-advised to implement procedures for careful record-keeping when it comes to communicating with parents during referrals.

the Alternate School during the 2013-2014 school year.[19]

## IV.

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment (ECF No. 13) is **DENIED,** MCPS' Cross-Motion for Summary Judgment (ECF No. 16) is **GRANTED,** and the Decision of the ALJ is **AFFIRMED.** This case is therefore **CLOSED.**

A separate Order will **ISSUE.**

### FINAL ORDER OF JUDGMENT

Upon consideration of Plaintiffs' Motion for Summary Judgment (ECF No. 13), Defendants' Cross-Motion for Summary Judgment (ECF No. 16), and the oppositions filed thereto, oral argument having been held thereon, it is, for the reasons stated in the accompanying Memorandum Opinion, this 5th day of May, 2016

### ORDERED

1. Plaintiffs' Motion for Summary Judgment (ECF No. 13), is **DENIED;**

2. Defendants' Cross-Motion for Summary Judgment (ECF No. 16), is **GRANTED;**

3. The Decision of the ALJ is **AFFIRMED;**

4. The Clerk of Court is directed to **CLOSE** this case.

---

19. The parties also briefed the propriety of the Parents' placement of M.K. at the Alternate School. As the Court has determined that MCPS did not deny M.K. a FAPE for the 2012-2013 and 2013-2014 school years, the Court need not address this issue.